# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched* )<br>*or identify the person by name and address)* )<br>)<br>3505 Camino Del Rio South, Unit #310, )<br>San Diego, California )<br>("Target Location") ) | Case No.    '23 MJ01038 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Attachment A

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 | Distribution of controlled substances |
| 21 USC 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

See Affidavit referenced herein

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Matthew Rhoa, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and state:   San Diego, California

*William V. Gallo*
*Judge's signature*

Hon. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS**

I, Matthew Rhoa, being duly sworn, declare and state:

**PURPOSE OF AFFIDAVIT**

1.     This affidavit supports an application for a warrant authorizing the search of the following location further described in Attachment A, incorporated herein:

      a. 3505 Camino Del Rio South, Unit #310, San Diego, California ("**Target Location**").

2.     As further described in this affidavit, the **Target Location** is closely associated Merary Arturo PEREZ Munoz (PEREZ) and Mark NAEMI (NAEMI). The investigation to date has included surveillance at the **Target Location** where investigators believe evidence of narcotics distribution by PEREZ and NAEMI is likely to be found at the **Target Location**. A prior search warrant for the **Target Location** was obtained on March 21, 2023, from U.S. Magistrate Judge William V. Gallo.  This second search warrant for the **Target Location** is requested based on new information obtained after the first warrant was executed. Paragraphs 10 through 21 below were included in the initial search warrant for Target Location.  Paragraphs 22 through 29 below contain new information obtained since the last search warrant was obtained.

3.     I respectfully submit that the facts contained herein demonstrate there is probable cause to believe that fruits, instrumentalities, and evidence of violations of federal criminal laws, specifically, Title 21, United States Code, Sections 841(a)(1), 843(b), and 846 still exist at the **Target Location**. Therefore, I request authorization to seize those items, as further described in Attachment B, incorporated herein.

4.     Except as otherwise noted, information set forth in this affidavit has either been observed or provided to me by investigators with whom I have spoken, who have been involved in this investigation, or whose reports I have read and reviewed.

5.     Because this affidavit is being submitted for the limited purpose of seeking the search warrant specified above, I have not set forth each and every fact learned during

the course of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrants.

### TRAINING AND EXPERTISE

6.      I am a Special Agent with Homeland Security Investigations and have been so employed for approximately five years. Collectively, I have over 20 years in law enforcement, having previously worked with the Federal Air Marshal Service and as a police officer in Michigan. I am currently assigned to the San Diego Fentanyl Abatement & Suppression Team (SD-FAST). For the last several years I was on the San Diego Narcotics Enforcement Team Task Force. I have participated in over 200 covert drug-investigation actions and subsequent investigations. I generally investigate violations of the United States Code with an international nexus, including drug importation and trafficking. My main duties include investigating the trafficking of illicit controlled substances and the importation and distribution of illegal substances in violation of Title 21 of the United States Code.

7.      I am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

8.      As a federal law enforcement officer, I have received formal training and extensive on-the-job training and experience pertaining to the investigation of drug trafficking, and other techniques used for contraband smuggling. I have investigated trafficking of illicit controlled substances and other crimes that have resulted in arrests, indictments, and convictions.

9.      While participating in these and other criminal investigations, I have executed search warrants on businesses, residences, vehicles, and storage facilities. As a result of these investigations, I have become familiar with methods and techniques used by drug traffickers to import drugs into the United States and distribute those substances within the U.S. and the methods and techniques used by traffickers to derive, launder, and conceal

1  illicit proceeds, and to use these proceeds to promote and facilitate unlawful activity.

2  **FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE**

3  **A. Background of Investigation**

4  10.    In January 2023, Homeland Security Investigations Special Agents received
5  information that PEREZ, was offering to sell bulk fentanyl powder and fentanyl pills,
6  commonly called "M30s." An undercover agent (UCA) began communicating with
7  PEREZ to negotiate a deal to purchase fentanyl. These communications were recorded.
8  During the communications, PEREZ mentioned having access to an "office" to conduct
9  the transaction.  PEREZ explained that the office allowed safety and security to conduct
10  drug transactions, as it was out of view of the public.

11  11.    PEREZ is currently on probation with the State of California and is required
12  to wear a GPS ankle bracelet. On February 7, 2023, PEREZ's Probation Officer confirmed
13  that PEREZ is frequenting 3505 Camino Del Rio South, Unit #310, in Mission Valley, San
14  Diego, California (*i.e.*, the **Target Location**). From surveillance, agents have confirmed
15  that this is an office address. PEREZ's Probation Officer has also reported that PEREZ
16  previously listed this address as a place of employment where he was a janitor but does not
17  currently claim to work there. According to the GPS ankle bracelet, PEREZ spent several
18  hours at the building of the **Target Location** across several days. According to the
19  Probation Officer, the business that claimed to be employing PEREZ at the **Target
20  Location** was Credit Financial Consultants ("CFC") Consulting; the employment offer
21  letter was signed by NAEMI.  Based on surveillance, there is no evidence that this business
22  exists at the **Target Location** or any other suite within the building of the **Target
23  Location**.

24  12.    A United States Postal Inspector confirmed only two recipients were receiving
25  mail at the **Target Location**: 1) Merary Munoz, Munoz Latinos Consulting 2) Mark
26  Naemi, Credit Financial Consultants.

27  13.    A record check of California Office of the Secretary of State showed that
28  "Munoz Latinos Consulting LLC" filed articles of organization on January 12, 2023. The

principal address is listed as the **Target Location**. The mailing address has an "attention" line to "Merary or Arturo." The agent listed for service of process is "Merary Perez Munoz" and the management structure states the LLC will be managed by "One Manager." Based on this information, investigators believe PEREZ is the owner and/or manager of Munoz Latinos Consulting LLC. Surveillance of the **Target Location** from January 2023 through the date of this affidavit revealed that no legitimate business operations occurred.

### B. February 7, 2023

14. On February 7, 2023, while conducting surveillance at the building of the **Target Location** from the parking lot, agents watched PEREZ meet with an unknown male, who was carrying a bag into the building of the **Target Location.** A few moments later, the unknown male exited the building of the **Target Location** alone without the bag and returned to his vehicle in the parking lot but did not leave immediately. A review of the DMV records for the vehicle determined the registered owner of the green Toyota Sequoia was N.R. Further records checks confirmed the individual that met with PEREZ was N.R. The green Toyota Sequoia was captured by a license plate reader in San Bernardino County approximately two hours prior to arriving at the parking lot of the building of the **Target Location**. Taking this information together, I believe N.R. traveled from San Bernardino County to the **Target Location** for the purpose of dropping off a bag there.

15. A short time later, a different male left the building of the **Target Location** and entered a blue Toyota Camry but did not leave immediately. The male was identified as Angel Daniel JACOBO by comparing a previous arrest-booking photograph to the male seen at the building of the **Target Location**. Furthermore, the approximate height, weight, and age all matched California DMV and prior arrest records. I am aware that JACOBO is currently awaiting sentencing in the Southern District of California for a smuggling event on September 7, 2021, involving nine kilograms of methamphetamine. JACOBO is currently staying in a sober-living facility a few miles away from the **Target Location**; this is the same sober-living facility that PEREZ is staying in as part of his probation.

16. Eventually, PEREZ left the building of the **Target Location** and got into a white Chevrolet Equinox. At that point, all three cars left the parking lot in tandem. Surveillance units followed the vehicles for several miles and noted all three vehicles stayed in tandem and all made several turns together. Surveillance was stopped before the vehicles arrived at their final destination.

### C. February 11, 2023

17. In the morning hours of Saturday, February 11, 2023, law enforcement conducted surveillance on the **Target Location**. Because it was a weekend, many of the offices in the building where the **Target Location** is located were not open. Surveillance units noted the parking lot nearly empty. JACOBO arrived in his blue Toyota Camry and entered the building of the **Target Location** with a black backpack. PEREZ also arrived separately in his white Chevrolet Equinox and entered the building of the **Target Location**. Approximately fifteen to twenty minutes later, surveillance units saw JACOBO leave the building of the **Target Location**, enter his blue Toyota Camry, and drive away. PEREZ exited the building of the **Target Location** a brief time later and left in his vehicle.

### D. February 22, 2023

18. On February 22, 2023, law enforcement conducted an operation, in which a UCA purchased 20,000 "M30" pills from PEREZ at the **Target Location**. Just prior to the agreed-upon meet time, JACOBO arrived at the parking lot at the **Target Location** in the blue Toyota Camry. JACOBO was observed walking into the building of the **Target Location** carrying a disposable yellow tote-style bag that appeared weighted down. A short time later, PEREZ and JACOBO were seen exiting the building of the **Target Location**. At that point, PEREZ was now carrying the yellow tote-style bag. JACOBO and PEREZ entered JACOBO's blue Toyota Camry and waited until the UCA arrived. The UCA arrived a short time later and parked in the parking lot. PEREZ exited the blue Toyota Camry and got into the UCA's vehicle. While in there, the UCA provided PEREZ the payment for the 20,000 "M30" pills. PEREZ then got out of the vehicle and returned to the blue Toyota Camry, where JACOBO remained. PEREZ retrieved the yellow tote-style

bag and walked it back to the UCA, giving it to the UCA.  The yellow tote-style bag contained 20 zip lock style bags full of "M30" pills, which weighed 2.23 kilograms and tested positive for the characteristics of fentanyl.

19.    After the UCA purchased the narcotics, PEREZ and JACOBO went back into the building of the **Target Location** for a short duration before reemerging. PEREZ and JACOBO were seen clasping hands and then hugging briefly in the parking lot before PEREZ and JACOBO went to their respective vehicles and left. When JACOBO left the parking lot, he only traveled to the parking lot of the next address to the east. JACOBO parked next to a gray Dodge Challenger and Edgar MARTINEZ (MARTINEZ) got out of the Challenger and into JACOBO's vehicle. The male sat in the JACOBO's vehicle for approximately 7-8 minutes before leaving in the Gray Dodge Challenger[1].

**E. March 9, 2023**

20.    On March 9, 2023, law enforcement conducted an operation in which a UCA purchased one kilogram of fentanyl powder. Again, the meeting occurred in the parking lot of the **Target Location**. Just prior to the meet, a white Toyota Sequoia arrived in the parking lot of the **Target Location**. A DMV records check showed the vehicle was registered to a male and a female with different last names, but with the same address as MARTINEZ in Ontario, California.  MARTINEZ entered the building of **Target Location** on March 9, 2023, carrying a black soft-sided zippered case in one of his hands.

21.    After the UCA arrived in the parking lot, PEREZ came out to meet with the UCA and collect the cash for payment. PEREZ took the money and entered the building of the **Target Location**. A Special Agent was stationed inside the common-area hallway on the third floor of the office building where the **Target Location** is located, and watched PEREZ enter the **Target Location**. The Special Agent overheard two male voices speaking Spanish before the door was closed. A short time later, PEREZ exited the **Target Location** and delivered a black soft-sided zippered case to the UCA in the parking lot. This case

---

[1] A DMV records check of the license plate on the Challenger shows the registered owner of the Challenger to be Brayan MARTINEZ, who is Edgar Martinez.  Initially law enforcement believed the individual seen that day was Brayan Martinez.  However, subsequent investigative steps revealed the person seen was actually Edgar Martinez.

appeared to be the same black soft-sided case MARTINEZ carried into the building of the **Target Location.** Inside that case was one vacuumed-sealed "brick" of a white powdery substance. A short time later, MARTINEZ left the building of the **Target Location** and entered the white Toyota Sequoia.

### F. March 22, 2023

22.     On March 9, 2023, a UCA conducted an operation to purchase four kilograms of fentanyl powder and 30,000 "M30" pills. While conducting surveillance in the hours before the schedule purchase, law enforcement saw MARTINEZ arrive at the adjacent parking lot in a Dodge Challenger. MARTINEZ met with an unknown male carrying a duffle bag. The two men gave each other a "fist bump" and met at the trunk of the Challenger. The unknown male was observed placing the bag into the trunk of the Challenger and then the two men sat inside the vehicle but did not leave. After some time, the unknown male left the vehicle and walked to a nearby retaining wall near the street entrance to the parking lot where he sat down.  The unknown male appeared to be looking around the area and into parked vehicles.  Based on my training and experience, this unknown male was serving as a "lookout."  Meanwhile, MARTINEZ drove the Dodge Challenger from the adjacent parking lot into the back parking lot of 3505 Camino Del Rio South.   MARTINEZ met with JACOBO and Andres HERNANDEZ ("HERNANDEZ") who were standing near a Toyota Corolla in the furthest rear corner from the street. MARTINEZ, JACOBO, and HERNANDEZ stood outside the two vehicles occasionally inspecting and rearranging bags between the two vehicles.

23.     A short time later PEREZ pulled into 3505 Camino Del Rio South parking lot driving a Chevrolet Camaro. PEREZ parked in the back parking lot and entered the building. Shortly after PEREZ entered the building, JACOBO, HERNANDEZ and MARTINEZ carried two backpacks and an orange rectangular box from their vehicles into the building. The UCA received a text message from PEREZ containing a video showing the drugs had arrived. Once PEREZ, JACOBO, HERNANDEZ, and MARTINEZ were inside 3505 Camino Del Rio South, Unit #310, HSI Special Response

Team (SRT) approached the building to execute a search warrant. As they approached the building, MARTINEZ was seen walking back towards his vehicle and was encountered in the parking lot. SRT arrested MARTINEZ at approximately 3:20 p.m.  When SRT got to Unit #310, they found PEREZ, HERNANDEZ, JACOBO, and Mark NAEMI ("NAEMI") and arrested them at approximately 3:20 p.m.

24.    A subsequent search of Unit #310 found four "bricks" of a white substance, several thousand blue pills stamped "M30" in an orange rectangular box, a money/currency counter, and a handgun registered to NAEMI.  A sample of the bricks tested positive for the characteristics of fentanyl and methamphetamine and a sample of the pills tested positive for fentanyl. The four bricks weighed 4.28 kg. (9.41 lbs.), and the "M30" pills weighed 3.44 kg. (7.56 lbs.).

25.    During a post-Miranda interview, PEREZ admitted that the four bricks and pills were fentanyl and he intended to sell them that day for $72,000. PEREZ stated that NAEMI was aware that the drugs were present because he saw the drugs when they were brought into the office.  PEREZ also show agents a text message he received from NAEMI asking PEREZ to remove drugs stored in the ceiling of Unit #310.  PEREZ stated the drugs are still in the ceiling tiles because he received the text message less than 24 hours prior and he had not removed the drugs yet.  Then PEREZ drew a map of the office suite where he believed the drugs are located.

26.    During a post-Miranda interview, MARTINEZ admitted to being paid $1,500 for delivering the fentanyl the prior two times, February 22, 2023, and March 9, 2023, and that he was going to be paid another $1,500 if the deal was successful on March 22, 2023. MARTINEZ stated he did not know the exact type of drugs he was transporting but described the February 22, 2023, delivery as "blue bags" in the bag he delivered. MARTINEZ stated he was working for JACOBO.

27.    During a post-Miranda interview, HERNANDEZ stated he was going to be paid $500 to drive JACOBO and a bag, down to the meet on March 22, 2023.

HERNANDEZ stated he did not what to know the details of the deal, but he knew it was likely a drug deal because he knew JACOBO was in the drug trade.

28.     During a post-arrest interview, NAEMI denied all knowledge of drug activity. NAEMI stated PEREZ is his employee but only for remedial tasks.

29.     Based on my investigation and the observations of various agents, I believe the NAEMI and PEREZ both use the **Target Location** to conduct drug deals involving fentanyl. None of my investigation or surveillance has yielded any evidence that this is a legitimate business, nor that it keeps regular hours, has any legitimate customers or provides any legitimate services. Furthermore, I believe there will be further evidence and fruits of the crime of narcotics smuggling and distribution found inside.

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANTS

30.     Based upon my training and experience, consultation with other law enforcement officers experienced in drug investigations, and all the facts and opinions set forth in this affidavit, I believe probable cause exists that the **Target Location** is being used to further the distribution of controlled substances by PEREZ and NAEMI, as well as JACOBO, MARTINEZ, and HERNANDEZ in this judicial district and elsewhere.

31.     In addition, I know that:

a.     Individuals involved in drug trafficking often maintain the following items in their office where they conduct drug deals: controlled substances and paraphernalia for packaging, weighing, cutting, testing, and distributing. They will commonly have this contraband on hand, secreted at their premises or on their person, in order to maintain the confidence of their customers. The selling of such contraband is an ongoing type of business, because it takes time to develop clientele, the nature of drug abuse requires a steady supply, and the business tends to be too lucrative to abandon. They also have "fruits" of their illegal sales on hand, including United States currency and other valuables.

b.     Individuals involved in narcotics trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a

time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed.  Such pay/owe sheets or papers are used as a basis for accounting and settling existing debts. Such records are often maintained for a substantial period of time even after the debts are collected. I have found in my training and experience that such records are invaluable to narcotics traffickers and that such records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets frequently include the names, identities, and telephone numbers of suppliers, customers, and co-conspirators.

c.      Individuals involved in narcotics trafficking often rely on others to obtain their drugs and help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at the location of their residence/office and in their vehicles.

d.      Individuals involved in narcotics trafficking often utilize stash houses to store illegal narcotics; weigh, cut and package the illegal narcotics; store narcotics proceeds, and/or store information relating to their drug trafficking business.

e.      Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secrete, transfer, and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, offices, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences or offices of individuals involved in narcotics trafficking.

f.      Individuals involved in narcotics trafficking often keep and maintain large amounts of United States currency at their residences or offices. Such funds are often used for every-day expenditures and to maintain and finance their ongoing narcotics business.

g.      Individuals involved in narcotics trafficking often maintain weapons, firearms and ammunition on their person or in their residence or office and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences or office and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their narcotics and firearms dealings.

h.      Residences, premises, and/or vehicles used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

32.      It is also my opinion and belief that the above-described documents are currently possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date.  These documents are kept by narcotics dealers whether or not the dealer is in possession of any drugs or chemicals at any given moment.

**PRIOR ATTEMPTS**

33.      A search warrant was executed for the **Target Location** on the afternoon of March 22, 2023.  During the post-arrest interview of PEREZ, he provided additional information that suggests illegal narcotics may be hidden in the ceiling tiles of Unit #310. This additional search warrant is requested to return to the **Target Location** to search for additional narcotics.

**CONCLUSIONS**

34.      Based on all of the above, my experience and training, a review of documents and other relevant information I believe to be reliable, and discussions with other law enforcement officers, it is my opinion that the items listed in Attachment B are fruits,

instrumentalities or evidence of a violation of the following enumerated offenses: 21 U.S.C. Sections 841(a)(1), 843(b), and 846.  It is also my opinion that there is probable cause to believe that the items set forth in Attachment B are present at the **Target Location**, as more fully described in Attachment A.

35.    With the above information, I formally request the issuance of a search warrant authorizing a search of the **Target Location**, and the seizure of items described with particularity in Attachment B.

I declare under penalty of perjury the foregoing is true and correct to the best of my knowledge and belief.

Special Agent Matthew S. Rhoa
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 23rd day of March, 2023.

_William V. Gallo_

The Honorable William V. Gallo
United States Magistrate Judge

1

## ATTACHMENT A

### Description of Building to be Searched

*3505 Camino Del Rio South, #310, San Diego, California*

The premises and all parts therein, including all rooms, safes, storage containers, and ceiling tiles assigned to or part of the office suite located at 3505 Camino Del Rio South, #310, San Diego, CA ("**Target Location**"). The **Target Location** is located in here:



The building of the **Target Location** is a three-story, multi-unit commercial building located on the south side of Camino Del Rio South. The front of the building faces north and has the words "Padre Plaza" and the numbers "3505" written on large white letters/numbers in a scripted font written over the front door entrance.  The building is an "L" shape with clay-orange roof shingles, brown concrete at the corners with light color trim running horizontally underneath the windows. The building of the **Target Location** is the 5th building east of Scheilder Way and west of Interstate-15 (south) highway entrance.

1
2
3
4
5
6
7
8

The **Target Location,** office suite #310, is not listed on any of the building directories.  The **Target Location** is on the third floor in the section of the hallway running east/west. It is the third door from the east staircase, with the door on the south side of the hallway. The door has a wood grain appearance with a gold/black "No Soliciting" sign on the door. To the left of the door is a placard with the numbers "310". The placard has several horizontal rows where a business could hang a shingle. These rows are blank with the exception of the words "No Soliciting".





**ATTACHMENT B**

**Items to be Seized**

There is probable cause that the following constitute evidence of violations of 21 U.S.C. Sections 841(a)(1) and 846, and that they will be found in the **Target Location**:

1. Controlled substances, including fentanyl pills and powder.

2. Paraphernalia for packaging, using, weighing, cutting, testing, distributing, and identifying controlled substance(s).

3. Documents reflecting the possession or distribution of controlled substances, the acquisition of property obtained with proceeds from narcotics trafficking, and interstate and foreign travel in connection with narcotics trafficking.

4. Money, assets, and evidence of assets derived from or used in the possession or distribution of controlled substances and records thereof; including banking and financial institution records.

5. Items or personal property tending to show identity of persons in ownership, dominion and control of the **Target Location**.

6. Any tangible photographs which document an association with other coconspirators and/or which display narcotics or money and proceeds from narcotics transactions, including recorded surveillance footage from security systems.

8. Firearms.

All of the above constituting: (1) evidence of a violation of 21 U.S.C. Sections 841(a)(1) and 846; (2) contraband, fruits of the same offenses or other items illegally possessed; or (3) property designed for use, intended for use, or used in committing these offenses.